Slip Op. 15 - 28

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| TOSCELIK PROFIL VE SAC ENDUSTRISI A.S., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Court No. 13-00371 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| WHEATLAND TUBE COMPANY and | : | |
| UNITED STATES STEEL CORPORATION, | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

## OPINION

[Sustaining administrative redetermination of land subsidy benchmarks.]

Dated: April 1, 2015

*David L. Simon*, Law Offices of David L. Simon, of Washington DC, for the plaintiff.

*L. Misha Preheim*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of Counsel on the brief was *David P. Lyons*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

*Gilbert B. Kaplan* and *Jennifer D. Jones*, King & Spaulding LLP, of Washington DC, for the defendant-intervenor Wheatland Tube Company.

*Jeffrey D. Gerrish* and *Robert E. Lighthizer*, Skadden Arps Slate Meagher & Flom, LLP, of Washington DC, for the defendant-intervenor United States Steel Corporation.

Musgrave, Senior Judge:   The prior decision on the case, *Toscelik Profil ve Sac Endustrisi A.S. v. United States,* 38 CIT ___, Slip Op. 14-126 (Oct. 29, 2014) ("*Toscelik I*"), familiarity with which is here presumed, remanded *Circular Welded Carbon Steel Pipes And Tubes From Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2011,* 78 Fed. Reg. 64916 (Oct. 30, 2013) and accompanying issues and decision memorandum ("*IDM*") (together, "*2011 CVD Review*"), to the International Trade Administration, U.S. Department of Commerce ("Commerce" or "Department") for additional proceedings not inconsistent with that decision.   The results of remand, dated February 13, 2015,  are now before the court.  *Final Results of Redetermination Pursuant to Court Ordered Remand*, Ct. No. 13-00371, ECF No. 60 ("Remand").

According to those results, Commerce determined  that Toscelik's overall net subsidy rate changed from 0.83% to 0.44% and was *de minimis*.   On remand of the *2011 CVD review*, Commerce's reaction to the remand order is that "changes to an allocation stream may be appropriate under  certain  circumstances"  but  it  determined  on  remand  "that  this  is  not  one  of  those circumstances."  Remand at 5 (footnote omitted).  For the 2008 land subsidy, therefore, Commerce revised the benchmark to the weighted-average benchmark that had been utilized for it in the *2010 CVD Review.*[1]

For the 2010 land subsidy, Commerce first removed all duplicative land quotes from the 2010 land benchmark prices.  *Id.* at 6.  It then reviewed the 2010 land benchmark calculations

---

[1]  Remand at 2, referencing *Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty Administrative Review*, 77 Fed. Reg. 46713 (Aug. 6, 2012) and accompanying issues and decision memorandum (together, "*2010 CVD Review*"); *see also* Remand at 5.

and found "no evidence that any of the underlying data points should be considered . . . outliers or otherwise distortive.[ ]  Specifically, the allegedly comparatively expensive and developed land values identified by Toscelik and by the Court -- *e.g.*, Istanbul and Yalova -- which are contained in the 2008 benchmark, are not in fact contained in the data set used to value the 2010 land subsidy." *Id.* (footnote omitted).  Concerning the court's comments regarding Turkish Law 5084 being limited to Turkey's 49 underdeveloped provinces, Commerce responds as follows:

> [A]s an initial matter such general, regional classifications by the GOT, as indicated by Turkish Law 5084, do not provide us with sufficient information about how the level of development in the 49 provinces in question relate to land prices.  When considering factors that may speak to regional comparability for purposes of its land for LTAR benefit calculation, Commerce looks at, for example, the comparability of population density in the regions in question.[ ]  In addition, when examining regional comparability between the regions in question, Commerce may also examine evidence that support differences in land pricing, such as industrial property reports, availability of data on prices, investment flows, availability of land, and industry density.[ ]  There is no record evidence of this type regarding the regional classifications provided by the GOT.
>
> Additionally, as explained below, in these final results we limited the 2010 land benchmark calculation to the available land price data that correspond to calendar year 2010.  Upon closer review, we find that none of these data reflects land prices from within the 49 underdeveloped provinces that were the intended beneficiaries of this subsidy program.[ ]  As such, the issue of whether Commerce should restrict land prices used to develop the 2010 land benchmark to Turkey's 49 underdeveloped[ ] provinces is moot.
>
> We also continued to reject the use of the land values calculated by the GOT (e.g., the land prices charged by the GOT in connection with Toscelik's 2008 purchase of land in the Organized Industrial Zone) when deriving the 2010 land benchmark. First, as explained below, for the 2010 land benchmark, in these final results [Commerce] limited our benchmark to land prices corresponding to calendar year 2010.  Further, we find that land purchased from Turkish government authorities cannot serve as an appropriate benchmark for land values under 19 CFR 351.511 (a)(2)(i), because it pertains to prices charged by the very provider of the good at issue.  Our approach in this regard is consistent with our practice in this proceeding as well as with other CVD proceedings.[ ]

*Id.* at 6-7 (footnotes omitted). Next, concerning the court's comments in *Toscelik I* that Commerce

inconsistently used land prices from 2009, 2010, and 2011 to calculate the 2008 land benchmark in

the *2010 CVD Review*, Commerce determined, while solely relying on land prices from 2010 for the

2010 benchmark,

> that in the *2010 CVD Review* in which Commerce examined the GOT's 2008 sale of
> land to Toscelik, Commerce lacked benchmark prices that corresponded to the year
> in which the land transaction at issue occurred, which would otherwise have been our
> preferred choice.[ ] Thus, Commerce determined to rely upon benchmark land
> prices for years 2009, 2010, and 2011 (indexed to 2008) for purposes of calculating
> the 2008 land benchmark. In contrast, in the 2011 review, in which Commerce was
> examining the GOT's 2010 sale of land to Toscelik, Commerce had at its disposal
> land benchmark prices for 2010 and, thus, consistent with our preference for using
> benchmark prices that correspond to the year of the land transaction, relied solely on
> data points from 2010 when calculating the 2010 land benchmark.

*Id.* at 7-8 (footnote omitted). Concerning the relevance of contemporaneity when determining if a

data point is comparable for purposes of the LTAR benchmark, Commerce explained that it

> views contemporaneity as an important factor when determining whether a data point
> is comparable for purposes of the LTAR benchmark, since contemporaneous data are
> more likely to reflect the same prevailing market conditions with regard to the
> government transaction, as prescribed under section 771(5)(E)(iv) of the [Tariff]Act
> [of 1930]. Thus, as a matter of practice, Commerce generally limits its LTAR
> benchmarks to prices that match the year in which the government transaction took
> place when such data are available.[ ] We find no reason to treat land transactions
> any differently in this regard, given that land is similarly susceptible to temporal
> fluctuations in price. Thus, in these final results, we are continuing to measure the
> benefit from the GOT's sale of land to Toscelik in 2010 using available 2010 land
> prices to derive a contemporaneous land benchmark that reflects market conditions
> prevailing during the year of the government sale.

*Id.* at 8-9 (footnote omitted).

The court also asked for further clarification on the advantages and disadvantages of

simple versus weighted averages in the context of land benchmarking. Commerce explains that with

regard to land the Department has "generally departed" from weight averaging and that its "normal

practice" is now to rely on a simple-averaging method, and it points to comment 4 of the *IDM* for

its articulated rationale:

> Specifically, we said we lacked sufficient detail regarding the characteristics of the various parcels of land underlying the benchmark data- in particular, the extent to which the composition of our reference data set reflected the broader market-and that, therefore, we had no basis to assume that any one parcel of land among the reference set was more representative than any other parcel for the purpose of deriving a market price by which to determine adequate remuneration. [ ] Moreover, we stated that obtaining more detailed information beyond the general comparability factors such as land-use classification would be impracticable for the Department to undertake.[ ] We hereby provide further clarification on these points. By "the broader market," we simply mean the overall market of comparable land in Turkey, the exact parameters and composite functions of the properties (access to electricity, water, *etc*.) of which were not knowable to the Department and for which the available price data the Department was able to find could only be a partial sample which was solely based on the size and location of the properties. Accordingly, the Department felt it appropriate to qualify the use of such data by stating that we had no additional information as to the extent to which they might be representative of that overall market. Whether this particular set of sample price data, as opposed to any other set of data, was or was not reflective of that overall market, we simply did not and could not know.[ ]

> Unlike pricing on other commodity goods that are more widely traded, such as hot-rolled steel or wire rod, land prices are susceptible to more varied and more complex factors, *e.g.* , location, soil condition, prevailing climate, the level and quality of nearby public infrastructure, the composition and quality of other nearby commercial land uses, *etc*. Obtaining sufficient information regarding all these factors is not feasible for the Department to undertake with its resources, nor is it necessarily a requirement to determining the benchmark for our purposes.[ ] In this sense, the Department was not setting a requirement that "the composition of the reference data set must constitute proportional representation" of the overall market, as the Court implied. Rather, given the many unknowns behind the available data in terms of the exact factors affecting pricing and, thus, the lack of assurance that this data sample would be representative of the overall comparable market, the Department concluded that a simple average of the prices would be appropriate.

> In the first instance, there was no record evidence that a direct relationship existed between price and parcel size such that size should be factored in especially

as opposed to any of the other variables.[  ] Weighting the average by size would accord the prices of the larger parcels in the sample with greater significance in the benchmark, even if, in reality, those particular parcels were less comparable in terms of other factors that might influence price than the other parcels of smaller size.[  ] By using a simple average, the Department in effect accorded equal weight to all the pricing variables that may have affected the pricing of land in the available sample. Given the imperfect information regarding the parameters of the overall comparable market, we concluded that this was the appropriate approach.

*Id.* at 10-12 (footnotes omitted).

Toscelik filed comments supporting the outcome of the draft remand results, but requested that the final remand results explicitly indicate the revised program final rates. Commerce obliged. *See supra*. The petitioners filed no comments.

The parties' joint status report of February 21, 2015, adheres to those same positions, and the plaintiff and the defendant indicate that the remand results be sustained. ECF No. 61.

*Conclusion*

The results of remand appearing in compliance with the prior decision's orders of remand and supported by substantial evidence, and there appearing no opposition to sustaining them at this time, in view of the foregoing the remand results will be sustained and a separate judgment with this opinion entered to that effect.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: April 1, 2015
        New York, New York